We would like to notify all parties that we understand the video is making its way to our chambers, but it had not arrived before any of us left our respective chambers, either Pasadena or Las Vegas or Portland, before this argument, so we're blind on that point. And then I gather there is a letter which was placed here at the bench dated today from the government which needs to be explained, and I mention it now so that if the appellant wants to talk about it, he can do so. Counsel, you may proceed with oral argument. Thank you, Your Honors. Have you received the photographs? I'm sorry? Have you received the photographs that accompanied the videos? No? We have received nothing. And as I understand from our deputy clerk this morning, that we have information that whatever it was that we're set to receive, it was FedExed on Friday. Well, obviously, that's too late because we left chambers by Friday night, so. Okay. Your Honors, there are two issues that stand out in the administrative record for this case which I would like to address today. Can you hear me okay? Yes. Speak up just a little. Okay. Closer to the mic because it's a little touchy. Okay. The two issues I would like to speak to the Court today on are the legal issue under NEPA of whether an environment. Counsel, would you identify yourself for the record? Yes, Your Honor. Tom Woodbury, representing the appellants. I'd like to address the legal issue under NEPA as to whether or not an environmental impact statement is required for the capture facility. And I'd like to also address a factual issue of the record, which is whether there are documented and admitted violations of the incidental take statement in the administrative record before the Court. On the legal issue. I suppose the first question we should ask, is this a case about bald eagles or about buffalo? This is a case about bald eagles, Your Honor. And because of the location of the bison capture facility within 600 meters of a bald eagle's nest, which is a violation of the bald eagle management guidelines for Montana and Yellowstone Park, the Fish and Wildlife Service was consulted and they found that, quote, the proposed action would result in a significant increase in human activities and disturbances that are likely to add cumulatively to adverse effects on the horse butte nest site. In fact, Your Honors, these activities, excluding helicopter use, I might add, according to Fish and Wildlife, quote, would have the potential to adversely affect at least two and likely more bald eagles attempting to use the horse butte nest site, as well as two other eagles' nests on horse butte. Perhaps most significantly in the record, Fish and Wildlife Service found, quote, the service anticipates that one clutch, one to three eggs, or one brood, one to three eaglets, may be lethally taken annually due to abandonment of incubation prior to hatching eggs or inadequate sheltering of young adults. So we have here a federal action to permit the construction of a facility in violation of eagle management guidelines that is likely to adversely affect three eagles' nests and result in the death of between 10 and 30 eagles over the course of the life of the facility. And the Forest Service decided this is not a significant environmental impact requiring the preparation of an EIS under NEPA. Contrary to all the language, by the way, that I just read to you from Fish and Wildlife Service, which seems to have a different opinion of the significance of the project on those eagles' nests. Well, now, isn't there a dispute with respect to the causality, with respect to at least one of the nests, maybe the second one? The Ridge Nest, that's not a NEPA issue, Your Honor. That's an issue of whether or not the Forest Service should have re-initiated consultation under the terms of the Incidental Take Statement. And for purposes of NEPA, I can address that issue of re-initiation, but I would urge the Court not to confuse that with the initial legal issue of whether or not an environmental impact statement was required in the first place. If the Court were to uphold the decision not to prepare an EIS in this case, this would represent the first case in NEPA's history where taking the life of species protected under the Endangered Species Act was deemed insignificant.  I'm sorry, Your Honor. Let me repeat my question to this extent. Okay. And that is to say this would be the first time where there was the taking of the life of endangered species. Now, do we have to accept the allegation that it would have this impact? Yes. Or isn't that one of the issues to be determined? The dispute is over the Ridge Nest, which is not covered by the Incidental Take Statement. There is no dispute. The Incidental Take Statement presumes that the Horse Butte Nest would be sacrificed, essentially, so that there would be a taking under the ESA. And, in fact, in the same year that the Ridge Nest failed, the Horse Butte Nest also produced young, and those young did not survive. So there is no question that there is a take. It's a question of what is the extent of the take and whether or not the purpose of the Incidental Take Statement is to minimize that take over the life of the facility, not to avoid it. So the rationale offered up by the Forest Service for not doing an environmental impact statement was that, well, yes, the Forest Service admits there will be significant impacts to this Horse Butte Nest and potential impacts to the other nests on the Horse Butte Facility, but that's not going to result in the extinction of eagles from the United States or even from the Pacific Northwest. So there's no question that there is a take. But could you just say in 25 words or less why you think an EIS was required? I'm sorry, Your Honor? Why was an environmental impact statement required? It was not. Are you asking me why it should have been? It's required? No, that's what you're trying to argue. Okay. I just don't know which point you're trying to argue, and I'm trying to get it clear. I was just hoping. Because I understood that your main argument for why there was a NEPA violation was that there was a lot of controversy. No, that's not correct, Your Honor. The controversial aspect. Are you abandoning that argument? No, I'm saying that's not our main argument. Okay. Then what is it? The main argument is that this facility is being sited in an area that will result in mortality to species that are listed under the Endangered Species Act, and that is a significant environmental impact. And this Court itself has found that. The rationale of the Forest Service, this is key, Your Honor. The rationale of the Forest Service was, yes, it will have significant impacts on the Horseshoe Peninsula ecosystem, but it will not adversely, it will not jeopardize the existence of eagles in the Pacific Northwest or nationally. Yes. Okay. That same rationale, Your Honor, that local impacts are not significant under NEPA, was rejected by this Court in one of the whaling cases two years ago, where the Makah tribes said, and the whales at issue were not listed under the ESA. They're a recovered species. But the Forest Service offered the same rationale to this Court, that their impacts were only, would not be adversely impacted regionally or throughout the range of the gray whale, but only local impacts. And this Court said that's enough under NEPA. I guess I misread it, because I understood the finding to have been that all the potential effects on bald eagle populations at Site A-2 are not significant. That's not, no, Your Honor, that is not true. The Forest Service recognized in the finding of no significant impact that there would be significant impacts on that, on that nest. And the whole point of getting. On the. Horseshoe nest. The one nest. Yes. The Fish and Wildlife Service said that there was likely to be impacts on the other two nests as well. Though they didn't issue an incidental take statement for those. And they said if there were failures at the other nest, then we should reinitiate consultation. So I'm sorry. I'm sorry to be obtuse. I'm still just trying to narrow in on what you think is the actual NEPA violation. The NEPA violation. I misread your brief, and that's why I'm trying to get it clarified. Well, and that's why we're here today, Your Honor. And what I'm saying is that you can, you can never have a case where you're affecting the local ecosystem to the extent of taking species that are listed under the Endangered Species Act without doing a careful study of that under NEPA. That is a significant environmental impact. And you say that there wasn't a careful study done. There was not an EIS prepared, Your Honor. And this Court has also held an EA, no matter how thorough, can never substitute for an EIS for lots of reasons. One of the reasons is because they didn't consider a reasonable range. They don't have to consider a reasonable range of alternatives in an EA the way they would in an EIS. And they also, the comment periods were extremely short. Well, go back to your brief. The EIS argument that you're leading with today was your third argument in your brief. Your first argument was with respect to whether the finding of no taking of bald eagles was valid or not. If the finding of no taking. There was no finding of no taking. There was an incidental take statement issued, which means that there is a taking under the ESA. We're saying that the taking exceeded that allowed by the incidental take statement. But Judge Lovell found against you on that. Judge Lovell tried to say that the burden was on us to prove that the ridge, in order to require reinitiation of consultation, that the burden was on us to prove that the ridge nest failed because of helicopter hazing, which is incorrect. In fact. Reinitiation wasn't raised in the district court, was it? The issue was only raised broadly in general terms as violations of the ESA. But you're correct that. You're correct. It was raised in the pleadings. It was raised in the statement of material facts. It was raised in the pleadings? I missed that. Yes. They basically, in general terms, they didn't use the term reinitiation of consultation. I guess I didn't miss it. Yes. The other issue, so that's our seminal issue, Your Honor, that the court has to address, is whether or not an EIS was required in the first place for a project that would result in mortality of between 10 and 30 eagles, American eagles listed under the Endangered Species Act. The other issue has to do with the factual issue of violations of terms and conditions of the incidental take statement. And that is the issue of dispute over the video, what the video depicts and what the photographs depict. What should we be looking for in the video and in the photographs? The video and the photographs depict the same flyover, first of all, on April 20th of 2000. Video taken from the ground looking at the helicopter? Yes. Video taken from a sign demarcating the closure area for the horseboot eagle. And what I would ask the court, what I would point out to the court, is that when you look at these photographs, you will see an open meadow. That open meadow is itself the closure area, which is where no humans are allowed. And obviously the helicopter is not allowed in there. And then in the background of ER-269, you see a stand of trees. And then the helicopter above, either above the stand of trees or above the meadow. And what I would just point out to the court is that stand of trees is outside of the closure area. It's on the other side of Pine Avenue. And Pine Avenue marks the perimeter of the closure area. So basically the issue of dispute is not, as it turns out, over whether or not this helicopter is violating. Counselor, if I can just, I just want to interrupt just for clarification. When you say it's outside of the closure area, are you talking about the 15 square mile area? No. Are you talking about the one half mile? No, actually this is a closure area around the nest itself. And then in addition to the closure area where you can't even, you're not supposed to even walk into this area, then there are no-fly zones of circles around the nest. Okay. So the no-fly zone basically encompasses an 800 meter radius circle. At this point, what's your contention as to how far that helicopter is from the nest at that point in this picture? And my contention, Your Honor, is that the court does not need to address that because essentially what the Forest Service itself, I'm sorry, what the Department of Livestock itself admitted in their affidavit at SER, Montana, we've apparently admitted that there is at least one incident in which a helicopter violated the terms and conditions of the ICF. But just to humor me about how far in that picture is the helicopter, do you contend the helicopter is from the nest? Yes. Just so that I can help orient it myself. What you will find, Your Honor, is that what the Department of Livestock and the Forest Service both say in response to that video is that the helicopter is flying along Pine Avenue to the intersection, flying south along Pine Avenue to its intersection with Forest Road 610 and 6697. Okay. So now all this court has to do then to establish that that is a violation of the incidental take statement and the no-fly zone is refer them to a map, the only map in the record that actually depicts the no-fly zone. And that map is at ER 236. Mr. Woodbury, what is the significance of MDOL's violation, assuming that it happened? Yes. There is no discretion for violations of an incidental take statement. When there are violations of the terms and conditions of an incidental take statement under the ESA, the Fish and Wildlife Service must revoke that permit as exceeding the take authorized. It's an extremely strict standard in order to protect species under the ESA. What are you asking for here? I mean, the Forest Service permit was very clear. So the Forest Service didn't itself do anything to harass the eagles. The agency has unaware of any authority that allows sort of an argument that the Forest Service somehow has responsibility for its permittees. The Forest Service has continuing authority. It's an enforcement authority. Sure, it has enforcement authority, I suppose. But the Fish and Wildlife Service incidental take statement, in the biological opinion, charges the Forest Service with responsibility for enforcing those terms and conditions. And when terms and conditions are violated, the ESA says that the permit must be revoked. So you're here asking for the permit to be revoked? We're here asking for a mandamus injunction against the Forest Service to pull the permit and to do an EIS. If I might complete my ---- Counsel, you're down to about three minutes. You may wish to reserve or use at your choice. I'd like to at least complete my point, Your Honor. The map at page ER-236, the road going north to south that intersects and enters into the no-fly zone at the northeast, basically at the northeast corner or northeast perimeter of the circle, that road that goes down south and then hooks up, it goes right up to the closure area, the hatched area is the closure area itself for the nest. It goes right to the edge of that inside Zone 2 and then hooks up with the plow lines that you see on here, which are 610 and 6697. That is Pine Avenue. And that is what the DOL and the Forest Service found the helicopter was flying over. And that is what is depicted in the videos and the photographs. And that is a violation. And, Your Honors, that is not the only violation. Before I sit down, I just want to point out the issue of whether these are rebutted or unrebutted. The March 31, 1999, allegations of violations of snowmobiles within a quarter mile of open water before 10 a.m. was confirmed after an investigation by the Forest Service. And the hazing within the closure area without preapproval from the district ranger, as required by the incidental take statement, was also confirmed. They said, well, Forest Service LEOs on site allowed that. But that is not allowed by the incidental take statement. There has to be preapproval from the district ranger. So that was investigated and confirmed. And that's the only careful investigation of any of these allegations. The 420-2000 flyover I just indicated to you is basically admitted in the record. The April 4, 2001, ATVs in Zone 2 was not denied in the record. And the incident of ATVs in Zone 2 off the road on April 7, three days later, was admitted at SCR 129. And the violations of April 12, 2001, a helicopter over the closure area was unrebutted, affidavit of Pedersen. And the violation of January 8, 2002, of firing cracker shots into the closure was similarly unrebutted, meaning that there are a total of eight violations of the terms and conditions of the incidental take statement in the record, established in the record as unrebutted or admitted. And all it takes is one violation of the incidental take statement under the ESA, under the ESA strict enforcement provision to require the revocation of a permit. And here we have eight violations, and that permit is still active. So, yes, we're asking this court to basically issue mandamus against this facility to revoke the permit and to require an environmental impact statement before that facility is used again. Counsel, this court can't issue the mandamus, can it? The court can issue an injunction against the continued implementation of the permit. What we can do is reverse this case and send it back with instructions to Judge Lovell. Okay. Are we agreed or not? I want to be sure that you're not giving us more power than we think we have. I'm not sure, Your Honor. All right. Thank you, counsel. Thank you. Your time has expired. We will now hear from the government. Good morning. May it please the Court. Susan Pahulski on behalf of the United States. First of all, I'd like to point out that although the appellant is raising the issue of the permit, he didn't raise that issue in his briefs on this appeal. He did make that argument in the district court. The district court rejected the argument that a single instance or, you know, that an instance of violation of the terms of the incidental take statement would require revocation of the permit. The district court rejected that argument. The incidental take statement was issued pursuant to consultation carried out under the Endangered Species Act. And although the incidental take statement requires the Forest Service to enforce the terms of the permit, the consequences of a failure to do so or the consequences of a violation of the terms of the incidental take statement are simply that the incidental take coverage is no longer provided. So if the Fish and Wildlife Service were to determine that the Forest Service hadn't enforced the terms of the permit or that the terms had been violated and that a take had occurred, there would be no coverage for that take under the incidental take statement. So a Section 9 proceeding for a take could proceed, whereas basically they'd be stripped of the coverage of the incidental take statement. Revocation is not required, and that issue wasn't raised in the briefs on appeal. With respect to the videotapes and the photographs, we submitted in the supplemental excerpts of record letters from the Forest Service refuting the claims of helicopter incursions that are reported to be depicted in the videotapes and the photographs. And we also submitted an affidavit of the Montana Department of Livestock Bison Program specialist who went through carefully looking at each clip on the videotapes and looking at the photographs and explaining why none of them showed violations. The counsel for Coal Mountain is correct that there was an instance of ATV use or snowmobile use near open water prior to 10 a.m. on one instance. I believe that was March 1999. And the Forest Service was notified of that and investigated it and determined that there had been a violation, and it wrote the Montana Department of Livestock a letter reminding it of its obligations and asking it to be sure to comply with the terms of the incidental take statement. I'd also point out that the Forest Service, even when it concluded, such as with the April 20, 2000, helicopter flyover, the one that the Coal Mountain's attorney was showing you the photograph of, the photographs and a videotape of that helicopter flyover were submitted to the Forest Service. The Forest Service concluded that that did not depict a violation of the terms of the eagle closures, but it nonetheless wrote to the Montana Department of Livestock to remind it to adhere to the terms of the incidental take statement. So I think the Forest Service is clearly paying attention to what's going on here. It's working with the Montana Department of Livestock, and it has no intention of allowing any violations of the terms and conditions of the permit. With respect to the NEPA issue, I think that counsel is confusing two separate concepts. There's the concept of a significant effect of a determination of likely to adversely affect under the ESA and a determination of significant environmental effect under NEPA. And the Fish and Wildlife Service did determine that, agreed with the Forest Service, that the placement of the capture facility within Zone 2 of the horse butte bald eagle nest was likely to adversely affect that eagle pair. However, that eagle pair had not been, hasn't been productive, very productive at all. It's only been productive one year out of the last 10, and the Forest Service determined that given that fact, that the specific bald eagle population is actually on the rise, the species is doing well, and given the fact that the placement of the capture facility in this location was very important to capture the maximum number of bison and allow for testing of them, it would place the facility in that area. But going back to, you know, in light of the fact that the bald eagle population was on the rise, that this nest wasn't very productive anyway, it determined that this was not a significant environmental effect for purposes of NEPA. And, you know, the Fish and Wildlife Service's issuance of an incidental take statement also sort of corroborates the Forest Service's conclusion in that respect. The Fish and Wildlife Service was willing to issue an incidental take statement for the horse butte nest because it concluded that the needs of the facility sort of outweighed the consequences to this nest, which usually wasn't productive anyway. It's only one year that it was productive, 1999. The capture facility was in operation, so it doesn't suggest that. You respond specifically to the search by Mr. Woodbury that this would involve the death of 10 to 30 eagles. You heard his statement here. What's your response to that? Well, I think he's looking at this is a 10-year permit, so eagles, bald eagles potentially produce one to three young per year. And so if you assume that this capture facility actually is going to result in the death of young eagles, then that's the number you could come up with. But the point is, the point that the Fish and Wildlife Service and the Forest Service looked at is the fact that this has not been a historically productive pair of eagles. I don't think it's necessary for this Court to look at, I mean, to do anything with the videotapes and the photographs that the appellants have submitted. The only relevance they have to claims raised on this appeal is the take claim and the reinitiation claim. And as counsel admitted, the reinitiation claim is weighed. The take claim, they haven't asserted a proper take claim against the Montana Department of Livestock. Their only take claim is against the Forest Service, which can't be said to have taken any acts or omissions that may have harassed the bald eagles through the operation of the helicopters or any other type of eagle hazing. Those are actions taken by the Montana Department of Livestock. And there's no theory of the implication is that they were permitted by the Forest Service. They were permitted. They were permitted at least. That's true, but even if that were so, that wouldn't mean that the Forest Service had committed a take under Section 9 of the ESA. In order to harass bald eagles, the Forest Service would have had to take some act or omission which itself annoyed the eagles to such an extent as to significantly disrupt their behavioral patterns. And it can't be said that a failure, if it occurred, to enforce the terms of the permit annoyed the eagles. What annoyed the eagles would be the helicopters and the ATVs, and those were actions taken by the Montana Department of Livestock. The Cold Mountain only sued the department itself, and the district court didn't attempt to bring ex parte young claims against any individual employees of the Department of Livestock, and therefore its claims against the state were thrown out. But that doesn't mean that it can transfer its claims to the Forest Service in a kind of vicarious liability sense. Counsel, Section 9 of the ESA in A1 there says it is unlawful for any person subject to the jurisdiction of the United States and then we go down to take any species. Is the Forest Service included in that phrase, any person? It is. Okay, so that does include, so the United States concedes that the Forest Service is included there. Yes, the Forest Service could in some situations be guilty of a take of endangered species. I'm saying in this instance the claim is harassment, and if one looks at the definition of harassment, which is set forth in the Fish and Wildlife Service's regulations, it's simply the Forest Service can't, through failure to enforce a permit, annoy listed species. Counsel, for the opponents also made the point that the issuance of the permit or the placement of the capture facility was a violation of the Bald Eagle Guidelines, and the Forest Service recognized the fact that the Monsanto permit was a violation of the Bald Eagle Guidelines. And the Montana Bald Eagle Guidelines, and I think also the Yellowstone Bald Eagle Guidelines, suggested that this level of activity, the level of activity associated with the capture facility, shouldn't be allowed within Zone 2 of an eagle nest. But the Forest Service, again looking at the considerations it was weighing, the historical non-productivity of this pair of eagles versus the need to capture as many bison as possible, decided that an amendment to the Forest Plan would be appropriate, and it therefore did amend the plan. The appellants didn't challenge the amendment to the Forest Plan, which then allowed the placement of the capture facility in this area. So it's actually not a violation of the Forest Plan because that amendment has been put in place, which hasn't been challenged. If the Court has no further questions, we would simply ask that the district court's ruling be affirmed. Thank you, counsel. The case just argued will be submitted for decision, and the Court may adjourn for the day. All rise. The Court for this session stands adjourned.
judges: O'scannlain, Rymer, Bybee